```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
AUDRA WEBSTER,

                    Plaintiff,
                                          MEMORANDUM & ORDER
         -against-                        18-CV-6863 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
----------------------------------X
APPEARANCES
For Plaintiff:     Christopher James Bowes, Esq.
                   Law Office of Christopher James Bowes
                   54 Cobblestone Drive
                   Shoreham, New York 11786

For Defendant:     Matthew Mailloux, Esq.
                   Paulina Stamatelos, Esq.
                   United States Attorney's Office
                   Eastern District of New York
                   271-A Cadman Plaza East, Seventh Floor
                   Brooklyn, New York 11201
```

SEYBERT, District Judge:

Plaintiff Audra Webster ("Plaintiff" or "Webster") brings this action pursuant to Section 205(g) of the Social Security Act (42 U.S.C. § 405(g)), challenging the Commissioner of Social Security's denial of her application for disability insurance benefits. Presently pending before the Court are Plaintiff's motion for judgment on the pleadings, (Pl. Mot., D.E. 10), and the Commissioner's cross-motion for judgment on the pleadings, (Comm'r Mot., D.E. 13). For the following reasons, Plaintiff's motion is GRANTED and the Commissioner's cross-motion is DENIED.

BACKGROUND[1]

Plaintiff applied for disability insurance benefits on December 31, 2014, alleging disability from May 23, 2014. (R. 10.) After her application was denied on July 22, 2015, Plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on October 16, 2017. (R. 10.) At the hearing, Plaintiff was represented by counsel, and she and a vocational expert testified. (R. 10.) On October 24, 2017, the ALJ issued her decision finding that Plaintiff was not disabled. (R. 10-21.) The Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner. (R. 1-3.) This action followed.

I. The Administrative Record

A. Plaintiff

Plaintiff was 41 years old at the time of the hearing. (R. 31.) She had a high school degree. (R. 32.) She lived with her husband, six-year-old son, and mother. Her husband supported them and worked full-time. (R. 31-32.) For approximately 15 years before the hearing, Plaintiff worked as a shift supervisor at CVS.

---

[1] The background is derived from the administrative record filed by the Commissioner on May 9, 2019. (R., D.E. 7). For purposes of this Memorandum & Order, familiarity with the administrative record is presumed. The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.

The job included opening and closing the store, stocking shelves, ringing up customers, counting money, and supervising staff. (R. 32.) She stopped working on May 23, 2014. (R. 34.) According to Plaintiff, she could not work because she had "a lot of joint pain and a low-grade fever . . . [and was] very stiff in the morning." (R. 34.) She further explained that "[s]tanding for a long period of time is uncomfortable, sitting for a long period of time is uncomfortable." (R. 34.) She took pain medication and did not "want to drive on those [because they made her] a little loopy." (R. 34.) In an average week, she usually had "three good [days], four bad [days]." (R. 38.) Days following her monthly infusion were "pretty rough" due to "excessive joint pain. It's almost like having the flu because you run a low-grade fever from it . . . it's severe joint pain." (R. 39.) For those days every month, she was "pretty much in bed." (R. 39.) She did not get full nights of sleep "because of pain." (R. 136.)

As to her daily activities, she got her son ready for school and put him on the bus. She did "light laundry" where her husband brought the laundry down, her mom put it in the machine, and Plaintiff put it in the dryer. (R. 36.) She could not carry the laundry up or down stairs. (R. 138.) She napped in the afternoon before her son returned from school. Then they did "homework, bath, dinner, bed." (R. 36.) Washing and brushing her hair could be a problem for her. (R. 136.) If she ran errands,

3

she would do them first thing and wait to take her pain medication, because she did not want to drive on the pain medication. (R. 36.) She was "petrified to get behind the wheel of a car . . . driving on those kind of meds." (R. 43.) She made dinner "occasionally" and "help[ed] to the best of [her] ability." (R. 37.) She had switched to paper plates because she kept "breaking them." (R. 138.) Although she occasionally went to dinner or a movie, she had cut down on socializing because it was "just too much." (R. 37.) She tried "to keep [things} as normal as possible for [her son]" and attended his parent teacher conferences and sometimes took him to the park. (R. 36-37.) She had not taken any trips in the past several years. She used to enjoy gardening, but did not do it as much. (R. 37.)

Despite her medical issues, diagnosed as lupus and fibromyalgia, Plaintiff testified she would "love to go back to work." (R. 34.) She was in pain and often bed-ridden, and stated that "[i]t's not that I want to stay home, I want to go back. I just don't physically feel that I can do it." (R. 43.)

B. <u>Dr. Harley Cohen</u>

Plaintiff first saw treating physician and rheumatologist Dr. Harley Cohen in July 2014. (R. 251-55.) Plaintiff's chief complaints were joint pain and fever. (R. 251.) Cohen saw Plaintiff monthly for office visits and infusions. (R. 476.) Cohen gave Plaintiff Benlysta, a lupus medication injection,

4

which can "cause very serious reactions during or after treatment," (see "Benlysta Vial," available at https://www.webmd.com/drugs/2/drug-155458/benlysta intravenous/details) several times over the course of treating her. (See, e.g. R. 507, 510.) She was also prescribed serious medications such as Vicodin, Hydrocodone, and Flexeril. (R. 507.) Cohen often noted tender points. (R. 216, 224, 244, 254, 513.)

In an April 2016 Residual Functional Capacity Questionnaire (R. 476-80), Cohen diagnosed Plaintiff with fibromyalgia and lupus (R. 476). His "predominant clinical finding [was] widespread soft tissue tender points." (R. 476.) Cohen opined that in an eight-hour workday, Plaintiff could sit for less than 15 minutes at a time and stand for less than 15 minutes at a time. (R. 477-78.) In total, she could sit or stand less than two hours in an eight-hour workday. (R. 478.) She could occasionally (6% to 33% of a workday) lift less than 10 pounds, rarely lift 10 pounds, and never lift over 20 pounds. (R. 477, 479.) She could occasionally twist, rarely stoop or crouch, and never climb ladders or stairs. (R. 479.) She could grasp, turn, manipulate, and reach for less than 30% of a workday. (R. 479.)

According to Cohen, Plaintiff's pain was "frequently" severe enough to interfere with her attention and concentration to even simple work tasks. (R. 477.) "Frequently" is defined as 34% to 66% of an eight-hour workday. (R. 477.) Plaintiff was

5

"incapable of even 'low stress' jobs." (R. 477.) She would "frequently" need to take unscheduled 15 to 20 minute breaks. (R. 478.) Cohen estimated Plaintiff would likely be absent from work more than four days per month. (R. 479.)

    C.   <u>Dr. Andrea Pollack</u>

In June 2015, at the request of the Commissioner, consultative examiner Dr. Andrea Pollack saw Plaintiff. (R. 471-74.) Pollack observed Plaintiff to have a normal gait and the ability to walk on heels and toes without difficulty. She could squat fully and rise from the chair without difficulty. She did not use any assistive devices and did not need help changing or getting on and off the exam table. (R. 472.)

Pollack observed full flexion in the cervical spine, and full range of motion bilaterally in the shoulders, elbows, forearms, wrists, hips, knees, and ankles. (R. 473.) She found Plaintiff's "[j]oints stable and nontender." (R. 473.) She noted several fibromyalgia tender points. (R. 473.) She observed Plaintiff's "hand and finger dexterity intact [with g]rip strength 5/5 bilaterally." (R. 474.)

Pollack diagnosed Plaintiff with rheumatoid arthritis, fibromyalgia, lupus, migraines, hypothyroidism, and restless leg syndrome. (R. 474.) She opined that Plaintiff had "mild restrictions in bending, lifting, carrying, walking, standing, and sitting. She should avoid heights, operating heavy machinery,

6

activities which require heavy exertion, and activities which may put her at risk for [a] fall." (R. 474.)

   D.   Vocational Expert

   The vocational expert testified that Plaintiff could not perform her past work as a manager, which required a medium exertional level. (R. 40.) The expert stated that an individual with Plaintiff's limitations could perform sedentary work as an addresser (8,500 jobs in the national economy), stuffer (5,100 jobs in the national economy), or eyeglass frame polisher (1,000 jobs in the national economy). (R. 40-41.)

                           DISCUSSION

I.   Standard of Review

   In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

II.  The ALJ's Decision

   Here, the ALJ applied the familiar five-step process (see 20 C.F.R. §§ 404.1520, 416.920) and concluded that Plaintiff

was not disabled. (R. 20.) She found that (1) Plaintiff had not engaged in substantial gainful activity since May 23, 2014, the onset date (R. 12); (2) Plaintiff had severe impairments of systemic lupus erythematosus, fibromyalgia syndrome, anxiety, and depression (R. 12); (3) the impairments did not meet or medically equal a listed impairment (R. 12); (4) Plaintiff had "the residual functional capacity [("RFC")] to perform sedentary work . . . in that--in an 8-hour workday--she can sit approximately 6 hours, stand/walk approximately 2 hours and lift/carry 10 pounds occasionally, except that she can never kneel, crouch or crawl . . . She is limited to simple tasks with simple, one-or-two step instructions and a low-stress work environment" and thus could not perform her past relevant work as a manager (R. 14, 19); and (5) there are jobs that exist in the national economy that Plaintiff could perform (R. 20).

III. Analysis

Plaintiff argues that (1) the ALJ improperly disregarded treating physician Cohen's opinion (Pl. Br., D.E. 11, at 17); (2) the ALJ failed to address Plaintiff's subjective complaints (Pl. Br. at 21); and (3) at step five, the vocational expert failed to identify a significant number of jobs (Pl. Br. at 22). The Commissioner responds that (1) the ALJ's RFC finding is supported by substantial evidence (Comm'r Br., D.E. 14, at 15); (2) the ALJ appropriately considered Plaintiff's complaints of pain (Comm'r

Br. at 20); and (3) substantial evidence supported the step five finding (Comm'r Br. at 21).

    A.   <u>The Treating Physician Rule and the ALJ's Weighing of the Medical Opinion Evidence</u>

The "treating physician rule" provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998). The regulations state:

> Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).[2] Nevertheless, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." <u>Molina v. Colvin</u>, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citations omitted).

---

[2] "While the Act was amended effective March 27, 2017 [to eliminate the treating physician rule], the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect." <u>Williams v. Colvin</u>, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017); <u>see also</u> 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

9

When an ALJ does not afford controlling weight to the opinion of a treating physician, she must consider several factors: "(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). The ALJ must also set forth "'good reasons' for not crediting the opinion of a [plaintiff's] treating physician." Id. "An application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician rule, he nonetheless stated that [the physician's] opinion . . . was contradictory to the rest of the record evidence.").

Here, the ALJ gave "less weight" to Cohen's opinion because "it [was] not supported in his own treatment/progress notes or consistent [with Plaintiff's] description of a fairly broad range of daily activities[.]" (R. 17.) The ALJ characterized those activities as "showering and dressing independently,

10

cooking, cleaning, doing light laundry, getting her son ready for school in the mornings and providing childcare daily, running errands and driving to the bank or grocery store and back, going to school functions like parent-teacher night and parent-teacher conferences, going apple picking, socializing with friends, going out for dinner or to a movie occasionally and playing computer games." (R. 17.)

The ALJ also concluded that Cohen's clinical findings did "not support functional limitations of the degree assessed . . . in his [April 2016] Fibromyalgia Questionnaire." (R. 17.) The ALJ observed that Cohen's notes reported, among other things, normal gait, normal range of motion in all joints, no evidence of joint effusion or joint instability, and normal strength. (R. 17.)

The Court finds that the ALJ did not give good reasons for giving less weight to Cohen's opinion. First, the Court finds that the ALJ mischaracterized Plaintiff's abilities and "fairly broad range of daily activities" and thus her daily activities did not provide a good reason for giving less weight to Cohen's opinion. (R. 17.) While the ALJ said Plaintiff could shower and dress independently (R. 17), Plaintiff had trouble buttoning shirts and pants so she switched to "sweatpants and anything that [she] can pull on" and had problems brushing and washing her hair (R. 157, 136). Plaintiff cooked only occasionally, and noted that

11

she had switched to paper plates because she kept dropping dishes and breaking them. (R. 138.) She could not finish meals or light household chores. (R. 142.) Plaintiff did not really do laundry--her mother or husband had to help her with most of the task as she could not carry laundry up or down stairs. While the ALJ states that Plaintiff spent time "socializing with friends" (R. 17), Plaintiff actually reported that she had cut down on socializing due to her condition, and that her friends mostly came to her so she did not have to go out (R. 37). And while the ALJ stated that Plaintiff ran errands and drove, Plaintiff repeatedly stated that she did not feel comfortable driving on her pain medication and only did errands in the morning before taking it. Thus, the Court finds that Plaintiff's activities of daily living did not necessarily contradict Cohen's assessment and do not indicate, as the ALJ found, that she "retains the capacity to function adequately to perform many activities associated with work." (R. 18.)

Next, the Court finds that Cohen's treatment and progress notes and clinical findings support his opinion. Over the course of two years, he saw and examined her numerous times, prescribed varying medications and treatments, observed tenderness, and performed blood tests indicative of Plaintiff's medical issues.

Had the ALJ given controlling weight to Cohen's opinion, Plaintiff would likely be unable to perform even sedentary work, which

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a). According to the Social Security Regulations, "[s]ince being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5.

In contrast, the ALJ assigned "great weight" to the consultative examiner's opinion because "it was based on a complete and thorough physical examination and history-taking." (R. 16.) Here, Pollack did not opine as to how long Plaintiff could sit or stand during an eight-hour workday--she only noted that Plaintiff had "mild restrictions." This is insufficient to support the ALJ's RFC finding. See O'Connor v. Berryhill, No. 16-CV-164395, 2018 WL 6161350, at *12-13 (E.D.N.Y. Aug. 30, 2018), R&R adopted, 2018 WL 4853051 (ALJ's reliance on consultative physician's opinion after

13

a single examination that the plaintiff experienced "mild limitations" was "at odds with [the opinions] of the treating physicians" and the consultative examiner's opinion was "too vague to provide sufficient support for the ALJ's specific functional assessments."); Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 348 (E.D.N.Y. 2010) (consultative examiner's statement that the plaintiff had "limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls" could not serve as an adequate basis for determining the plaintiff's RFC because it "did not provide enough information to allow the ALJ to make the necessary inference that [the] [p]laintiff could perform sedentary work"). Here, given that the ALJ assigned less weight to Cohen's detailed opinion, and great weight to Pollack's non-specific opinion, the ALJ was obligated to develop the record. See O'Connor, 2018 WL 6161350 at *13 (collecting cases). Accordingly, remand is necessary.

B. The Vocational Expert's Testimony

As this Court remands the case for a new hearing, it need not consider in detail Plaintiff's step five arguments. However, the Court notes that it seems unlikely that a person with fibromyalgia, arthritis, and use of her hands for grasping, turning and twisting only 30% of the time would be able to adequately perform the jobs of addresser, stuffer, or eyeglass frame polisher. See SSR 83-10, 1983 WL 31251 at *5 ("Most unskilled sedentary jobs

14

require good use of the hands and fingers for repetitive hand-finger actions."); R. 251 (Plaintiff reported her hands were stiff for approximately one hour every morning and she had to run them under hot water). Further, the Court has serious doubts as to whether a purported total of 14,600 jobs in the national economy is significant. The parties will be able to address the issue on remand.

## CONCLUSION

For the foregoing reasons, the Plaintiff's motion (D.E. 10) is GRANTED and the Commissioner's cross-motion (D.E. 13) is DENIED. The matter is REMANDED for further proceedings consistent with this opinion. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: January 2, 2020
      Central Islip, New York